# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0161-18T1

E.K.,

      Plaintiff-Respondent,

v.

B.B.,

      Defendant-Appellant.

_____

> Argued October 17, 2019 – Decided December 9, 2019
>
> Before Judges Whipple and Gooden Brown.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket Nos. FV-17-0428-18 and FD-17-0070-18.
>
> David Ryan Nussey argued the cause for appellant (Klineburger and Nussey, attorneys; David Ryan Nussey and Carolyn G. Labin, on the briefs).
>
> Walter J. Ray argued the cause for respondent (Masten and Ray, attorneys; Walter J. Ray, on the brief).

PER CURIAM

      Defendant B.B. appeals from the June 7, 2018 entry of a final restraining

order (FRO) against him following a trial in the Family Part, as well as the August 27, 2018 order denying reconsideration. Having thoroughly reviewed the record, we affirm.

Plaintiff E.K. and defendant B.B. were previously in a relationship and have two children together. They stopped living together in 2012.

On May 17, 2018, plaintiff filed for a temporary restraining order under the Domestic Violence (FV) docket (the FV matter) against defendant for harassment. Plaintiff alleged that on May 16, 2018, defendant called her fifteen to twenty times, and also started a group text with a mutual friend where he called her a "whore," "bitch," "baby killer," and "fat," among other things. Plaintiff alleged defendant continued this harassment by sending an email which accused "[her] of cheating [ten] years ago[,]" called "[her] a horrible mom[,]" stated "the kids would be better off without a mom," and that "[he] wishe[d] [she] were dead." Plaintiff alleged the harassment occurred on a daily basis despite civil restraints already in place restricting contact.

Contemporaneous with the FV matter, plaintiff filed an emergency order to show cause under the Non-Dissolution (FD) docket seeking sole custody of the parties' children. In support of her application, she alleged defendant was using illegal drugs and the children were not safe under his care. Plaintiff was

A-0161-18T1

particularly concerned with the defendant's plans to go white water rafting with the children.

On May 24, 2018,[1] the trial court held an initial hearing. The trial court advised defendant of his right to be represented by an attorney concerning the FRO request,[2] and offered to adjourn the matter to permit defendant to retain counsel. Defendant requested a continuance to consult with an attorney, and the trial court postponed the hearing until June 7, 2018. Defendant also requested that the FD hearing be heard on the same day.

Defendant arrived at the June 7, 2018, hearing unrepresented, despite the previously-given leave to consult with an attorney. Counsel for plaintiff asked the court to consolidate the FV matter and the FD proceedings, and defendant agreed. The matters then proceeded as a consolidated matter.

Plaintiff testified that since the termination of the parties' dating relationship, their main mode of communication was through text messaging and email. Plaintiff testified that on May 16, 2018, she received multiple messages and phone calls from defendant about their past history. She alleged defendant

---

[1] The transcript of the May 24, 2018 hearing was not included in the record.

[2] This is gathered from the trial judge's August 27, 2018, written decision denying reconsideration of the entry of the FRO.

called her, among other things, "a whore," "horrible [m]om," and a "stupid bitch." Plaintiff testified defendant stated, through their communications, that the "[k]ids would be better off without [her]." Plaintiff further testified that defendant's statements left her feeling both harassed and threatened. Plaintiff also testified that on May 17, 2018, defendant sent her more text messages and emails and expressed the desire to take their children white water rafting. Plaintiff refused, however, because a video she received showed defendant snorting drugs, which made her worry for the children's safety. Plaintiff also testified that defendant continued to make derogatory statements toward her, such as "[t]he kids would be better off without a [m]om[,]" and he "wishes [she] were dead."

Plaintiff also reported prior acts of domestic violence. Plaintiff testified she had received numerous text messages over the years in which defendant routinely made derogatory statements toward her, which forced her to obtain a civil restraint against defendant. Despite the civil restraint, however, defendant's inappropriate conduct persisted.

Plaintiff further testified that defendant asked their friend J.C. to put methamphetamine in plaintiff's coffee. Plaintiff learned about the plot from

J.C., and believed it was designed to "give [plaintiff] a heart attack" as well as to negatively impact her parenting time and her custody of their children.

J.C. also testified, stating she was in defendant's home on May 17, 2018, and observed defendant sniffing methamphetamine. J.C. videotaped defendant without his knowledge and sent the video to plaintiff. The judge viewed the video on J.C.'s cell phone[3] and found "[i]t's clearly Mr. [B.]. He says, 'They're buying balls now instead of grams, which is what I want.' And then he leaned over and sniffed something."

J.C. further testified that the following day she was in defendant's home and defendant asked her to put "drugs in [plaintiff's] coffee so she would fail a urine [test] for DYFS."[4] J.C. testified that she agreed, but suggested the drugs be put into the plaintiff's creamer because placing the drugs "in one cup of coffee would kill her." J.C. testified she had no intention of going through with the plan and instead informed plaintiff.

Defendant testified and denied communicating with plaintiff on May 16 and 17, asserting that his last text communication with plaintiff occurred on May

---

[3] We were not provided with the video as part of the record.

[4] The agency is now known as the New Jersey Division of Child Protection and Permanency.

A-0161-18T1

15. Defendant admitted the May 15 conversation was a group text message with plaintiff and J.C., as he hoped J.C. would act as a neutral mediator. Defendant also conceded he called plaintiff a "fat bitch," but denied planning to murder her or wanting her to die. Defendant opined plaintiff's intentions were never to co-parent with him but instead to make his life difficult. Although defendant admitted to the conversation with J.C. about putting substances in plaintiff's coffee, he contended the plot was J.C.'s idea. Defendant also denied ever taking methamphetamine, and told the court his lawyer was not present because defendant could not afford for him to come to the hearing.

The trial judge made detailed credibility findings and entered the FRO, having found plaintiff to be a protected person under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35. The trial court found that plaintiff demonstrated, by a preponderance of evidence, that defendant purposefully engaged in harassment under N.J.S.A. 2C:33-4, a predicate offense under N.J.S.A. 2C:25-19, when

> on May 16, 2018, the plaintiff received several text messages from defendant. He called her a whore, a bitch, a horrible [m]om and indicated that the children would be better off without her. The plaintiff felt threatened by these messages and . . . defendant['s] increasing anger. She also felt harassed by those messages and his escalating anger.

A-0161-18T1

On the [seventeenth] . . . there . . . had been a planned trip to go white water rafting. The plaintiff . . . indicated to defendant . . . she was not in favor of that trip any longer. She had come across a video that was provided by her witness. It shows Mr. [B.] . . . snorting something, leaning forward and snorting something. This caused the plaintiff some . . . significant concerns. The defendant indicated that he was going to take the children anyway.

She also received text message[s] on that date, as well, calling her fat, a horrible [m]om. The kids would be better off without her, that he wishes that she were dead.

While the trial court found the discussion between J.C. and defendant regarding placing methamphetamine into plaintiff's coffee credible and alarming, the court did not rely upon that incident as a predicate act for the FRO. Rather, the court only found the predicate act of harassment, under N.J.S.A. 2C:33-4, based on the harassing communications which were well-supported by the record.

The court issued the FRO against defendant and granted plaintiff temporary physical custody of the parties' children. The court also ordered defendant to undergo a psychological evaluation and submit to drug testing. The court then suspended defendant's parenting time with the children, but allowed defendant to speak with them from 7:00 - 7:30 p.m. via telephone.

7

On or about June 25, 2018, defendant moved for reconsideration. Specifically, defendant argued that at the June 7 hearing, he was unrepresented and was not advised of his right to have an attorney present. Defendant also expressed dissatisfaction with the manner of the proceeding and the court's determination. Defendant further argued the court did not adequately address the second prong of Silver,[5] which requires a finding that an order of protection was necessary to protect plaintiff. Defendant also presented text messages between J.C. and plaintiff not previously presented to the court. Defendant's certification in support of his motion asserted that he believed the June 7 hearing was for custody only. Defendant also argued he was never put on notice of the allegations of drug use and an alleged poisoning plot, as none of those allegations were in the domestic violence complaint. Lastly, defendant argued that the text messages, which were the basis for the FRO, were never entered into evidence.[6]

---

[5] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

[6] After reviewing the trial testimony it does not appear the texts were ever shown to the court, but the court relied upon testimony.

On August 27, 2018,[7] the trial court denied defendant's request for reconsideration of the FRO, noting that during the May 24, 2018, hearing, defendant reported he spoke with his lawyer and explicitly requested an adjournment when the court asked him how he wanted to proceed. The court also rejected the new text messages defendant presented that he purported were between the plaintiff and J.C., giving them little probative weight as they were not date stamped, did not have an identifying phone number, and seemed to only be segments of the conversation. The court reiterated there were sufficient grounds under <u>Silver</u> to issue the FRO against defendant. The trial court acknowledged the transcript lacked specific language that an order of protection was necessary to protect plaintiff, but she had determined that the allegations in the consolidated proceedings warranted the restraining order and denied reconsideration. This appeal followed.

Our review of a trial judge's factual findings are limited. <u>Cesare v. Cesare</u>, 154 N.J. 394, 411 (1998). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." <u>Id.</u> at 411-12 (citing <u>Rova Farms Resort, Inc. v. Inv'rs Ins. Co.</u>, 65

---

[7] On August 28, 2018, the trial court issued an amended order, but the contents of the order were largely identical.

A-0161-18T1

N.J. 474, 484 (1974)). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, [we] should accord deference to family court fact[-]finding." Id. at 413. Deference is of significant importance in cases where evidence "'is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). We accord deference to the findings of the trial court unless the findings "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citations omitted). Our intervention is warranted only when the trial judge's factual findings and legal conclusions "'are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms, 65 N.J. at 484). We will review questions of law determined by the trial court de novo. Smith v. Millville Rescue Squad, 225 N.J. 373, 387 (2016) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

When considering a domestic violence complaint, a court must first determine whether the plaintiff can demonstrate, by a preponderance of credible evidence, that the defendant has committed a predicate act under N.J.S.A. 2C:25-19(a). Silver, 387 N.J. Super. at 125 (citations omitted). Under N.J.S.A.

10

2C:25-19(a), a person commits "domestic violence" if he or she commits, among other things, harassment pursuant to N.J.S.A. 2C:33-4. N.J.S.A. 2C:19(a)(13). The statute enumerates three different forms of harassment, and each form requires proof of the purpose to harass. See State v. Hoffman, 149 N.J. 564, 576-77 (1997). The harassment statute provides, in pertinent part:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4.]

In applying this statute, "the words and phrases used by the Legislature should be accorded their normal and accepted connotations as well as their ordinary and well understood meanings." Hoffman, 149 N.J. at 580. Therefore, the term "harass" must be given its ordinary meaning which "includes: 'annoy'; 'torment'; 'wear out' and 'exhaust.'" State v. Castagna, 387 N.J. Super 598, 607 (App. Div. 2006) (citations omitted).

In determining whether a defendant has violated N.J.S.A. 2C:33-4(a) (subsection (a)) courts must focus on the mode of speech utilized. Hoffman, 149 N.J. at 583. "Speech that does not invade one's privacy by its anonymity, offensive coarseness, or extreme inconvenience does not lose constitutional protection even when it is annoying." Id. at 583-84. To satisfy the definition of subsection (a), plaintiff need only bring forth sufficient proof of a single communication by defendant, so long as his purpose was to harass and was made in a manner which is likely to cause annoyance in the recipient. J.D. v. M.D.F., 207 N.J. 458, 477 (2011). Our Supreme Court has concluded that a court may find a defendant's purpose is to harass based on inferences from the evidence presented, noting that common sense and experience may guide that determination. See Hoffman, 149 N.J. at 577 ("a finding of a purpose to harass may be inferred from the evidence presented. Common sense and experience may inform that determination.") (citations omitted); M.D.F., 207 N.J. at 477 (citing Hoffman, 149 N.J. at 577).

After a court determines a defendant has committed one of the predicate acts enumerated in N.J.S.A. 2C:25-19(a), the court must then determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C: 25-29(a)(1) to -29a(6), to protect the victim from an

immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127 (citations omitted). Specifically, courts should consider, but are not limited to, the following factors:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1) to -29(a)(6).]

While the trial court noted it did not use specific language in the transcript regarding its determination that the FRO was necessary to protect plaintiff from defendant, "in its totality, the [trial court] found there were grounds to issue a restraining order against [defendant]." We agree that the ample evidence in the record of defendant's harassing behavior toward plaintiff, despite the presence

of a civil restraint, supports the trial court's finding that the FRO was necessary to protect plaintiff from defendant under the second prong of Silver.

Applying these standards and having carefully reviewed the record submitted, we reject all of defendant's arguments, many of which are belied by the record. We add the following comments regarding defendant's argument he was denied due process because the court considered evidence not enumerated in the FV complaint.

"The Fourteenth Amendment of the United States Constitution provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.'" H.E.S. v. J.C.S., 175 N.J. 309, 321 (2003) (citations omitted). While the New Jersey constitution does not explicitly enumerate the right to due process, it protects values similar to those included in the principles of due process. Ibid. "At a minimum, due process requires that a party in a judicial hearing receive 'notice defining the issues and an adequate opportunity to prepare and respond.'" Ibid. (quoting McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 559 (1993)).

Here, defendant was not denied due process because the trial court based its decision to grant the FRO on allegations that were enumerated in the FV

14

complaint. Moreover, defendant was on notice of the allegations of both the FV and the FD complaint and agreed to the consolidation of those proceedings.

Defendant's other arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0161-18T1